I'll IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRANCIS GATES, Individually and as Administrator for the Estate of Olin Eugene "Jack" Armstrong, PATI HENSLEY, SARA HENSLEY, and JAN SMITH | ) ) ) ) ) | Case No. 11 C 8715<br>11 C 8913<br>12 C 1836 |
| Plaintiffs, | ) ) | 12 C 2983 |
| v. | ) ) | |
| SYRIAN ARAB REPUBLIC, et al., | ) ) | Judge Virginia M. Kendall |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Frances Gates, individually and as administrator for the estate of Olin Eugene Armstrong, Pati Hensley, Sara Hensley and Jan Smith (together "Plaintiffs" or "Gates Plaintiffs") move for turnover of assets in the form of electronic funds transfers ("EFTs") believed to belong to the Banque Centrale de Syrie ("BCS") and presently held in two intermediary bank accounts located at JPMorgan Chase Bank, N.A. ("JPMCB").   In response to this motion, JPMCB filed a complaint for interpleader, Case No. 2983 (the "JPMCB Interpleader Complaint"), which complaint the Gates Plaintiffs move to dismiss.  Plaintiffs' Motion for Turnover (the "EFT Turnover Motion") is granted in part and denied in part without prejudice and Plaintiff's Motion to Dismiss the JPMCB Interpleader Complaint is granted in part and denied in part.

## RELEVANT FACTS

### A.  Case History

The Gates Plaintiffs initiated this case on December 8, 2011 when they registered their $412,909,587 judgment against the Syrian Arab Republic ("Syria") in this district. The United States

District Court for the District of Columbia entered the $412,909,587 judgment on September 26, 2008 as compensation to the Gates Plaintiffs for Syria's acts of state-sponsored terrorism that facilitated the kidnapping, torture, and murder-by-beheading of Americans Olin Eugene "Jack" Armstrong and Jack L. Hensley in 2004. The Gates plaintiffs acquired this judgment under the Foreign Sovereign Immunity Act's ("FSIA") "terrorism exception," 28 U.S.C. § 1605A, and the District of Columbia Circuit Court affirmed that judgment on May 20, 2011. *See Gates v. Syrian Arab Republic*, 646 F.3d 1 (D.C. Cir. 2011). Syria filed an appearance and contested the $412,909,587 judgment before the D.C. Circuit Court.

On August 23, 2011, the D.C. District Court issued an order pursuant to 28 U.S.C. § 1610(c), finding that a reasonable period of time had elapsed from the entry of final judgment and notice to Syria and therefore Plaintiffs were authorized to enforce the court's judgment. After the Gates Plaintiffs registered their judgment in this district, this Court[1] issued a third-party citation to discover assets to JPMCB (the "Citation"). The Gates Plaintiffs served the Citation on a JPMCB bank branch in Elgin, Illinois. Pursuant to a protective order, JPMCB answered the Citation and indicated that JPMCB held accounts that might be responsive to the Citation. Based on JPMCB's answer to the Citation, the Gates Plaintiffs filed two motions for turnover against JPMCB, one related to certain third-party funds held at JPMCB and owned by AT&T, Inc. that were destined for a Syrian telecommunications company (the "First AT&T Turnover Motion") and the second - the EFT Turnover Motion that is the subject of this Opinion - related to certain EFTs that involved the Banque Central de Syrie but are presently held by JPMCB in its capacity as intermediary bank.

---

[1] This case commenced before Judge Lindberg. The case transferred to this Court by Executive Order on August 30, 2012.

2

On February 13, 2012, six days after the Gates plaintiffs filed the First AT&T Turnover Motion, attorneys for another group of plaintiffs (the "Baker Plaintiffs"), who also held a judgment against Syria and had registered that judgment in this district, *Baker v. Syrian Arab Republic*, 11 C 8913, filed a motion to intervene in this matter. The Baker Plaintiffs argued that they should be allowed to intervene in the Gates case as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2) because their interest in any Syrian funds held by Chase was superior to the Gates plaintiffs' interest in those funds. In a February 15, 2012 order, this Court granted the Baker Plaintiffs' permissive intervention into this case pursuant to Rule 24(b)(1)(B). Shortly after allowing the Baker Plaintiffs to intervene in this case, for purposes of judicial economy and with the agreement of the district court in this case, case 11 C 8913 was transferred to this Court's docket. Accordingly, the Gates and Baker cases, 11 C 8715 and 11 C 8913 respectively, are now assigned to this Court.

On March 7, 2012, this Court issued an opinion determining that the Gates Plaintiffs had first-priority rights to any Syrian funds at issue in the first motion for turnover, and determined that AT&T, Inc., the owner of the account at issue in the First AT&T Turnover Motion, was the property party to whom a motion should be directed, and therefore denied the First AT&T Turnover Motion with leave to refile. The Gates Plaintiffs refiled the motion, this time directed at AT&T (the "Second AT&T Turnover Motion" Docket No. 77) on March 9, 2012.

On March 13, 2012, AT&T filed a related complaint for interpleader (Case No. 12-1836, the "AT&T Interpleader Complaint") to determine the relative priority of the rights of all parties with respect to the funds contained in the accounts at issue in the Second AT&T Turnover Motion. On April 23, 2012, JPMCB filed the JPMCB Interpleader Complaint to determine the relative priority

3

of the rights of all parties with respect to the funds at issue in the EFT Turnover Motion. Both cases being related to the Gates and Baker cases, the AT&T Interpleader Complaint and the JPMCB Interpleader Complaint were consolidated with the Gates and Baker cases. The Gates Plaintiffs moved to dismiss both interpleader actions.

On August 30, 2012, these related cases transferred to this Court. On September 29, 2012, this Court granted the Second AT&T Turnover Motion and, subject to agreement by the parties on the terms of a turnover order, granted the motion to dismiss the AT&T Interpleader Complaint. The Baker Parties filed a motion to reconsider the March 7, 2012 order on grounds of personal jurisdiction over the accounts at issue in the First and Second AT&T Turnover Motions. Today, this Court denied the motion to reconsider. The Court now turns to the pending EFT Turnover Motion and related motion to dismiss the JPMCB Interpleader Complaint.

### B. The EFT Turnover Motion

Plaintiffs served the Citation on JPMCB on December 8, 2011. JPMCB returned the Citation and indicated that it had two accounts, each held in the role of "Intermediary Bank" and each containing the proceeds of electronic funds transfers in which BCS was in some way involved. The two accounts (collectively the "EFTs") total roughly $76 million. JPMCB also revealed a simple deposit account in the name of BCS (the "Deposit Account") containing $419 as of the time of the citation. The Gates Plaintiffs seek turnover of the EFTs and the Deposit Account pursuant to 28 U.S.C. § 1610(g) and § 201(a) of the Terrorism Risk Insurance Act ("TRIA") because BCS is an "agency or instrumentality" of Syria. JPMCB does not object to the Gates Plaintiffs' legal theory that certain assets may be turned over pursuant to one or both of these statutes. With respect to these particular accounts, however, JPMCB objects to the turnover of the EFTs and the Deposit Account

on three grounds: (1) the EFTs are held by JPMCB as an "Intermediary Bank" and as such may be

governed by the Uniform Commercial Code Section 4A rather than federal law and, if so, are not

subject to execution under either 28 U.S.C. § 1610 or TRIA § 201; (2) the EFTs and the Deposit

Account are potentially assets of a central bank and therefore may be immune from execution under

28 U.S.C. § 1610 and TRIA § 201; and (3) all parties to the EFTs have not received notice or a

chance to interplead their rights to the EFTs.

**DISCUSSION**

### A.  Turnover of assets of BCS under 28 U.S.C. §1610(g) and TRIA § 201

Section 1610(g) of the FSIA and Section 201 of the TRIA each permit attachment against

assets of a foreign state, or an agency or instrumentality of that foreign state, in aid of execution of

a judgment obtained under 28 U.S.C. § 1605A.   Section 1610(g) states:

> (1) In general.  Subject to paragraph (3), the property of a foreign state against which
> a judgment is entered under section 1605A, and the property of an agency or
> instrumentality of such a state, including property that is a separate juridical entity
> or is an interest held directly or indirectly in a separate juridical entity, is subject to
> attachment in aid of execution, and execution, upon that judgment as provided in this
> section, regardless of--
>
>> (A) the level of economic control over the property by the government of the
>> foreign state;
>> (B) whether the profits of the property go to that government;
>> (C) the degree to which officials of that government manage the property or
>> otherwise control its daily affairs;
>> (D) whether that government is the sole beneficiary in interest of the
>> property; or
>> (E) whether establishing the property as a separate entity would entitle the
>> foreign state to benefits in United States courts while avoiding its obligations.
>> ...
> (3) Third-party joint property holders.  Nothing in this subsection shall be construed
> to supersede the authority of a court to prevent appropriately the impairment of an
> interest held by a person who is not liable in the action giving rise to a judgment in
> property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1610(g). Section 201 of the TRIA states, in relevant part:

> (a) In General.–Notwithstanding any other provision of law, and except as provided in subsection (b)[2], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), codified at 28 U.S.C. § 1610 Note.

There is no dispute that the Gates Plaintiffs have obtained a valid judgment against Syria as a terrorist party pursuant to § 1605A. Therefore, pursuant to the terms of the statute they may seek attachment against the "property" of BCS under § 1610(g), and the "blocked assets" of BCS under TRIA § 201, upon showing that BCS is an "agency or instrumentality" of Syria. 28 U.S.C. 1603(b) defines an "agency or instrumentality of a foreign state" as any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in [28 U.S.C. 1332(c) and (e)], nor created under the laws of any third country.

28 U.S.C. § 1603(b). Section 201(a) of the TRIA also employs the phrase "agency or instrumentality" to authorize attachment to "blocked assets of" a terrorist party, "including the blocked assets of any agency or instrumentality of that terrorist party". TRIA § 201, Pub. L. No. 107-297, 116 Stat. 2322, 2002 Note to 28 U.S.C. § 1610.

---

[2] Subsection (b) of § 201 addresses diplomatic property and is unrelated to the issues here.

The Gates Plaintiffs have sufficiently demonstrated - and no party has objected - that BCS is an "agency or instrumentality" of Syria. The Second Circuit has created a balancing analysis to be used when addressing whether an entity is an "organ of the state" under § 1603:

> Although there is no specific test for "organ" status under the FSIA, various factors are relevant: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Hausler v. JPMorgan Chase Bank, N.A.,* 845 F. Supp. 2d 553, 572 (S.D.N.Y. 2012) ("*Hausler II*") (quoting *Filler v. Hanvit Bank*, 378 F. 3d 213, 217 (2d Cir. 2004). "*Filler* invites district courts to engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weight in favor of, or against, the entity." *European Cmty. v. RJR Nabisco, Inc.*, 814 F. Supp. 2d 189, 292 (E.D.N.Y. 2011).

In many cases, including the circumstances in *Hausler II*, it can be difficult to obtain documents that might aid plaintiffs in determining whether the *Filler* factors can be satisfied since the entity at issue might not have documentation publicly available and may not respond to requests for discovery. In the case before this Court, however, the evidence of BCS' connection to the SAR is publicly available. According to the English-version website of the BCS, the BCS' duties and activities are governed by "Law No. 23" passed by Syria in December 2001. A copy of the English version of Law No. 23 is publicly available on the BCS website. *See* www.banquecentrale.gov.sy/main-eg.htm

With respect to the first and second *Filler* factors, whether Syria created BCS for a national purpose and whether Syria "actively supervises" BCS, Article 51 of Law No. 23 states that "The Central Bank of Syria is a public institution of a financial and administrative independence that

carries out the Monetary policy decided by the Credit and Monetary Council. It operates under the state supervision and guarantee, within the general trends of the economic policy approved by the cabinet." Article 53 of Law No. 23 capitalizes the BCS with 10 billion Syrian pounds, underwritten in full by Syria directly. Article 56 declares that Syria may commission BCS by law to issue treasury bonds and represent the state in negotiations of foreign loans, within terms determined by the Minister of Economy & Foreign Trade.

With respect to the fourth *Filler* factor, whether BCS holds exclusive rights to same right in Syria, BCS has numerous exclusive rights in Syria, set forth in Articles 60-62, and including, but not limited to, conducting all gold & foreign currency operations, deducting and relinquishing short, medium, and long- term bonds issued by the state, granting loans and credits against those bonds, and accepting deposits of funds from account opened with approval of the Credit and Monetary Counsel. Article 56 declares BCS to be Syria's bank, and includes among its duties to represent Syria in foreign loan negotiations, issue treasury bonds, express permission to use the state emblem of Syria (Article 51.3), exemption from the "general rules and regulations of state accounting laws" (Article 51.2).

With respect to the third and fifth *Filler* factors, whether Syria requires the hiring of public employees and pays their salaries and the manner in which other states treat BCS, Law 23 provides less guidance, but what little it does further supports BCS as an "organ" of Syria. Article 57.2 provides that, at least with respect to each member of the foreign currency management committee, committee members shall be salaried monthly pursuant to a proposal of the Minister of Economy & Foreign Trade. And BCS's own charter document states when that BCS performs banking

8

function subjects to "private legal provisions" it shall do so according to those provisions but with the full guarantee of the state of Syria. (Article 57).

These statements in the BCS's founding document, public law and publicly available on the BCS' website, demonstrate that although the BCS is a separate entity from Syria, it is an "organ" of the Syrian state, and is an "agency or instrumentality" for purposes of attachment and execution of judgment under the FSIA and the TRIA.

There is, however, a potential exception to attachment and execution related specifically to foreign central banks. Section 1611(b) of the FSIA states:

> (b) Notwithstanding the provisions of section 1610 of this chapter, ***the property of a foreign state shall be immune from attachment and from execution, if***--
>
> (1) ***the property is that of a foreign central bank or monetary authority held for its own account***, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver.

28 U.S.C. § 1611(b) (emphasis added). The TRIA, enacted in 2002 and after the enactment of §1611(b), expressly addresses attachment to assets of third parties. As shown by the legislative history of the passage of the TRIA, Congress' purpose in enacting the TRIA was to create a method for victims of terrorism who had received judgments to enforce those judgments against assets of that terrorist party when these assets are located within the United States. Senator Tom Harkin, one of the TRIA's sponsors, described the TRIA's purpose as:

> to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgment from the frozen assets of terrorist parties ... [TRIA § 201(a)] establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such

enforcement under standard judicial processes, except as expressly provided in this act.

148 Cong. Rec. S11528 (Nov. 19, 2002) (statement of Sen. Harkin). The TRIA authorizes "holders of terrorism related judgments against [a terrorist state] ... to attach [that state's] assets that the United States has *blocked*." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 369 (2009). Although Section 201 appears in a note to the FSIA, rather than the text, the placement of a statement does negate or diminish its meaning so long as the statement is placed within the statutory scheme. "The plain language of the statute cannot be overcome by its placement in the statutory scheme ... This is even more clearly true in the case where the operative language begins with the phrase 'Notwithstanding any other provision of law,' thus making plain that the force of the section extends everywhere." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010). Given the explicit language of the TRIA and the purpose behind its enactment, and in light of its enactment occurring subsequent to the enactment of 28 U.S.C. § 1611, the conflict between the two must be resolved in favor of the TRIA such that BCS loses any right to immunity under 28 U.S.C. § 1611(b).

Courts that have addressed the interaction between the TRIA, the FSIA and other international immunity provisions have uniformly resolved statutory conflicts in favor of the TRIA *See, e.g., Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003) ("[T]he 'notwithstanding' clause [of § 201(a)] applies only when some 'other provision of law' conflicts with the TRIA"); *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, – F. Supp. 2d –, 2012 WL 4464243 (N.D. Ill. Sept. 25, 2012) (TRIA § 201(a) overrides United States sovereign immunity in blocked assets seized by the United States); *Hill v. Republic of Iraq*, 2003 WL 21057173 at *2 (D.D.C. March 11, 2003) ("[B]y its plain terms, the TRIA

10

overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under ...

the FSIA.").   The one court that has addressed the specific interaction of § 1611(b) and § 1610(g)

, on the one hand, and TRIA § 201(a) on the other hand, determined that any immunity granted by

§ 1611(b) has been overridden by the subsequently enacted TRIA § 201(a).  *See Weininger v.*

*Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) ("TRIA, which was enacted later in time than § 1611,

overrides the immunity conferred in § 1611").

Having found BCS to be an "agency or instrumentality" of Syria, and having found that §

1611(b) does not provide any exception to turnover of assets of such an agency or instrumentality,

and finding no disagreement from JPMCB that BCS is the legal owner of the Deposit Account and

the funds contained therein, the Deposit Account is appropriate for turnover to the Gates Plaintiffs.

The EFTs, however, must overcome an additional hurdle.

**B. The EFTs as "property of" or "assets of" BCS**

Having determined that a judgment creditor of Syria may seek attachment and execution

against assets of Syria's agency/instrumentality BCS under 28 U.S.C. § 1605A, the next

determination to be made is whether the EFTs are attachable assets.   The Second Circuit has

provided a succinct explanation of how an electronic funds transfer occurs and the players involved:

> An EFT is nothing other than an instruction to transfer funds from one account to
> another. When the originator and the beneficiary each have accounts in the same
> bank, that bank simply debits the originator's account and credits the beneficiary's
> account. When the originator and beneficiary have accounts in different banks, the
> method for transferring funds depends on whether the banks are members of the
> same wire transfer consortium. If the banks are in the same consortium, the
> originator's bank debits the originator's account and sends instructions directly to the
> beneficiary's bank upon which the beneficiary's bank credits the beneficiary's
> account. If the banks are not in the same consortium—as is often true in international
> transactions—then the banks must use an intermediary bank. To use an intermediary
> bank to complete the transfer, the banks must each have an account at the
> intermediary bank (or at different banks in the same consortium). After the originator

> directs its bank to commence an EFT, the originator's bank would instruct the
> intermediary to begin the transfer of funds. The intermediary bank would then debit
> the account of the bank where the originator has an account and credit the account
> of the bank where the beneficiary has an account. The originator's bank and the
> beneficiary's bank would then adjust the accounts of their respective clients.

*Shipping Corp. Of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009). In the

case of the EFTs at issue here, JPMCB is the "Intermediary Bank" and responded to the Gates

Plaintiff's Citation that it holds two intermediary bank accounts in which BCS is involved. In one,

it appears (although the schedule attached to the sealed exhibit has no headers) that BCS is the

originator and the beneficiary and the other banks are the originating bank and the beneficiary banks.

In the other account, it appears that BCS is the beneficiary only, with other institutions as the

originator, the originating bank, and the beneficiary bank. *See* Motion for ECF Turnover, Exhibit

1. According to JPMCB's response to the Citation, the EFTs were placed on hold in the two

accounts at issue because the EFTs were blocked pursuant to the Syrian Sanctions Regulations, 31

C.F.R. part 542 (the "SSRs").

The TRIA defines a "blocked asset" as "any asset seized or frozen by the United States under

section 5(b) of the Trading with the Enemy Act (50 U.S.C.A. 5(b)) or under sections 202 and 203

of the International Emergency Powers Act (50 U.S.C. § 1701, 1702)." TRIA § 201(d)(2), codified

at 28 U.S.C. § 1610 Note. The SSRs were authorized by 50 U.S.C. § 1701. *See* "Sources of

Authority," 31 C.F.R. Part 542. Therefore, the EFTs qualify as "blocked assets" under the TRIA.

It is clear that BCS is an agency or instrumentality of Syria, and it is clear that the EFTs are

"blocked assets" as defined in the TRIA. What is not clear is whether the EFTs are blocked assets

"of" BCS to permit attachment to those assets by the Gates Plaintiffs, because the EFTs at issue here

were "blocked" at the point when they were in the possession of JPMCB as intermediary bank.

12

Without having satisfied that requirement, the Court cannot grant the Gates Plaintiffs' EFT Turnover Motion at this time.

The Gates Plaintiffs urge this Court to adopt the reasoning of two district courts addressing turnover of blocked assets of terrorist states, *Hausler v. JPMorgan Chase Bank* (Cuba) and *Levin v. Bank of New York* (Iran), and find the fact that the beneficiary of blocked electronic funds is an agency or instrumentality of a terrorist state is determinative of ownership of those funds sufficient to permit attachment. *See Hausler v. JPMorgan Chase Bank ( "Hausler I"),* 740 F. Supp. 2d 525; *Levin v. Bank of New York*, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011); *see also Hausler II*, 845 F. Supp. 2d at 562 (reaffirming validity of holding of *Hausler I*). *Hausler I* and *Levin* both concluded that the TRIA preempts state property law and makes all assets subject to an OFAC blocking regulation "blocked assets of a terrorist party." *See Hausler I*, 740 F. Supp. 2d at 533; *Levin*, 2011 WL 812032 at *18-19. But *Hausler I* has since been questioned by another court of the same district. *See Ruth Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389 (S.D.N.Y. 2011). *Calderon* concluded that the TRIA did not preempt the determination of the existence of a property interest, which should be analyzed under New York State law. *See id.* at 400-401. Relying on Article 4-A of the New York Uniform Commercial Code and the Second Circuit's interpretation thereof, the *Calderon* court concluded that electronic funds in possession of an intermediary bank are not, at the time of possession by the intermediary bank, "property of" the originator or the beneficiary, but are property of the intermediary bank. *See id*.

*Hausler v. JPMorgan Chase Bank, N.A.* has been appealed. *See Hausler v. JPMorgan Chase Bank, N.A.*, *appeal docketed*, No. 12-1272 (2d Cir. April 5, 2012) . The United States has filed an *amicus curiae* brief in that appeal specifically tailored to whether the parties may invoke the TRIA

to attach to assets that are *not* owned by a terrorist party. *See Brief for the United States of America as Amicus Curiae*, 12-1264 Docket No. 34 (2d Cir. July 9, 2012); *attached as* Docket No. 34, Case No. 12-2983 (N.D. Ill. July 31, 2012). The United States has taken the position that the TRIA does not allow such an attachment without analysis as to whether the terrorist party, or its agency or instrumentality, has an ownership interest in the assets at issue. *See id. at* 14. As noted in the *amicus curiae* brief, OFAC regulations can deliberately cast a wide net over all transaction involving the state in question, and may well ensnare funds that do not belong to that state. This position comports with OFAC's interpretation of its own rules, submitted as a statement of interest in 2008:

> [T]he mere fact that assets have been blocked pursuant to the [sanctions regime] ... does not show that the assets at issue are owned by the [defendant government]. Rather, ... the fact that the assets are blocked establishes only that the [defendant government] has some blockable "property interest"—as the term is broadly defined by OFAC for purposes of the [sanctions] regime—in the assets.... Any determination of whether particular assets are not immune from execution under TRIA will require the Court to determine whether the [defendant government] has a sufficient ownership interest in the assets such that the assets are—in TRIA's language—assets "of that terrorist party."

*Calderon*, 867 F. Supp. 2d at 404, (quoting *Rux v. ABN Amro Bank, N.V.,* 08 Civ. 6588 (S.D.N.Y.))**.** "An agency's reasonable interpretation of its own regulations, even if it comes in the form of a legal brief, should be accepted unless it is 'plainly erroneous or inconsistent with the regulation'". *Calderon,* 867 F. Supp. 2d at 404 (citing *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008)). The Gates Plaintiffs urge this Court to find that the failure of third parties to challenge the blocking of the EFTs via petition to OFAC should lead this Court to conclude that they are owned. However, the Gates Plaintiffs provide no case support for this "negative notice" approach to turnover, and the Court has found none through independent research.

The Court is not convinced at this stage of the proceedings that the evidence presented to the Court, the account statements from JPMCB listing BCS being as the beneficiary of the EFTs, standing alone, can conclusively determine BCS' ownership of the EFTs, or that any analysis of ownership of electronic funds mid-transfer can be as cut and dry as the Gates Plaintiffs suggest. Upon further review, it may be the case that, unlike the Cuban regulations at issue in *Hausler* and *Calderon,* the SSRs - enacted subsequent to the TRIA - are entirely coextensive with the TRIA in scope, allowing this Court to conclude that "blocking" by the SSRs is conclusive of ownership. But at this stage in the proceedings, with little analysis by any party of the scope of the SSRs and no indication of any investigation into the flow of the EFTs other than as listed on the single-page exhibit provided by JPMCB, that conclusion would be premature.

Finally, the Gates Plaintiffs have suggested that, at a minimum, the account for which BCS is listed as both originator and beneficiary should be turned over. Again, the Gates Plaintiffs have not provided any record other than JPMCB's single-page exhibit. That is not sufficient for the Court to make that determination with any certainty at this stage. Without more information, the Court cannot, for example, rule out the possibility that funds destined for BCS as beneficiary in JPMCB's books are necessarily destined for BCS itself. Law No. 23, cited by the Gates Plaintiffs to support the conclusion that BCS is an "agency or instrumentality" of Syria, provides at Article 62 that BCS may hold deposits for accounts set up within BCS. *See* Law No. 23, *www.banquecentrale.gov.sy/main-eg.htm.* Unlike the accounts at issue in Second AT&T Turnover Motion, and the Deposit Account, the EFTs are *not* in an account actually belonging to BCS. They are funds in transit. Until the Gates Plaintiffs provide more information as to the details of that transit, the Court will not reach premature conclusions about the ultimate ownership of those funds.

15

### C.  Notice to Other Parties to the EFTs.

The best way to determine the details of the transition of the funds at issue in this case is to notify those who may be involved in the transit other than those who have presently appeared in this case and provide them an opportunity to appear and object to any turnover of the funds.   The Court is far from alone in having these concerns about providing notice to the parties involved in the EFTs.; even the *Hausler* and *Levin* courts permitted interpleader of other parties to those EFTs to allow those parties opportunity to offer grounds for why they had superior claims to those funds over the terrorism victims. *See Hausler I*, 740 F. Supp. 2d at 542 (authorizing interpleader petitions to "provide ample opportunity for the assertion of any superior claims" by "any interested third party ... not yet ... on notice of the blocked EFTs"); *Levin*, 2011 WL 812032 at *18-19 (S.D.N.Y. March 4, 2011) (noting previous entry of an order authorizing third-party interpleader complaints against assets in controversy)*; see also Hausler II,* 845 F. Supp. 2d 553 (addressing merits of interpleader petitions).  Additionally, section § 1610(g)(3), enacted subsequent to the TRIA, specifically cautions that any attachment and execution pursuant to § 1610(g)(1) shall not be "construed to supersede the authority of a court to *prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property* subject to attachment in aid of execution, or execution, upon such judgment."  28 U.S.C. § 1610(g)(3) (emphasis added). JPMCB, in its Response to the EFT Turnover Motion, raises valid concerns about the rights of other third parties not presently party to these cases who may have a claim to the EFTs and seek to hold JPMCB liable for the loss of the funds in the EFTs.  The Gates Plaintiffs call this suggestion "mere unbridled speculation" but where, as here, ownership issues have not been adequately addressed, together with

§1610(g)(3)'s exception to attachment to assets owned by third party, such speculation is entirely appropriate at this stage.

**Motion to Dismiss JPMCB Interpleader Complaint.**

The Gates Plaintiffs have moved to dismiss the JPMCB Interpleader Complaint on the same grounds that they seek turnover under the EFT Turnover Motion, namely, that the TRIA preempts state property law and that the scope of the TRIA and the scope of OFAC regulations are coextensive. Since the Court finds that these determinations of ownership are premature based on the facts presently before the Court and interpleader petitions are appropriate, the Court denies the Gates Plaintiffs' Motion to Dismiss the Interpleader Complaint as it relates to the EFTs.

Because the relative rights of the Baker Plaintiffs and the Gates Plaintiffs to the EFTs and the Deposit Account have been determined by this Court's prior orders of March 7, 2012 and September 28, 2012, and March 28, 2013, any concerns in the JPMCB Interpleader related to the Baker Plaintiffs have been addressed on the merits in the prior opinions and those claims are dismissed.

## CONCLUSION

For the reasons stated herein, the Gates Plaintiffs' Motion for EFT Turnover is granted as to the Deposit Account, and denied without prejudice as to the EFTs. The Gates Plaintiffs' Motion to Dismiss the JPMCB Interpleader Complaint is granted as to the rights of the Baker Plaintiffs and otherwise denied. JPMCB is directed to notify all parties to the EFTs within 30 days and advise them of these proceedings, this order, and their rights to interplead any claims that such party's ownership interest in the EFTs supersedes that of the Gates Plaintiffs as holders of a judgment under 28 U.S.C. §1605A. Any motions to interplead shall be filed in Case No. 11-8715. After all parties

have been notified, the Court will set a hearing date to determine whether any of the notified parties

have competing claims to the EFTs.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:   March 29, 2013