In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

Nos. 13-2280 & 14-1452

FRANCIS GATES, *et al.*,

*Plaintiffs-Appellees,*

*and*

AT&T CORPORATION,

*Respondent-Appellee,*

*v.*

SYRIAN ARAB REPUBLIC, *et al.*,

*Defendants.*

*Appeals of:*

PATRICK SCOTT BAKER, *et al.*,

*Intervenors-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-cv-08715 — **Virginia M. Kendall**, *Judge.*

———————————

ARGUED FEBRUARY 19, 2014 — DECIDED JUNE 18, 2014

———————————

2                                          Nos. 13-2280 & 14-1452

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. State-sponsored terrorism is an exception to the immunity usually available to foreign sovereigns in United States courts. The Foreign Sovereign Immunities Act (FSIA) expressly allows civil claims against foreign governments and their agencies and instrumentalities for acts of state-sponsored terrorism. See 28 U.S.C. § 1605A. The execution of such judgments against assets found in the United States is governed by 28 U.S.C. § 1610. In these appeals, we interpret § 1610 to resolve a dispute between two groups of victims of terrorism over the priority of their competing claims to the same assets to execute final judgments against the Syrian Arab Republic.

The origins of these appeals lie in terrorist violence sponsored by Syria. The appellants here are the Baker plaintiffs. Their claims stem from the 1985 hijacking of EgyptAir flight 648 by terrorists from Abu Nidal, a group supported by the Syrian government. In a standoff at the airport in Malta, hijackers shot plaintiffs Patrick Scott Baker and Jackie Nink Pflug in the head. Both survived somehow, but with serious injuries and permanent disabilities. Scarlett Marie Rogenkamp was also shot in the head and died. By the time the hijacking was resolved, 58 of the 95 passengers and crew had died. The Baker plaintiffs in these appeals are Mr. Baker, Mrs. Pflug, their family members, and the family of Ms. Rogenkamp.

The appellees are the Gates plaintiffs. They are the mother and sister of Olin Eugene "Jack" Armstrong and the widow and daughter of Jack L. Hensley. Mr. Armstrong and Mr. Hensley were civilian contractors working with the U.S. military in Iraq. They were kidnapped in September 2004 by al-

Qaeda in Iraq, which was also sponsored by the Syrian government. Mr. Armstrong and Mr. Hensley were then murdered. The gruesome murders of both men, who were conscious as they were slowly killed, were recorded on video that was made public by the terrorists.

Under the FSIA, both the Baker plaintiffs and the Gates plaintiffs have secured nine-figure judgments against the Syrian Arab Republic. The judgments hold Syria, designated by the United States government as a state sponsor of terrorism, responsible for the brutal acts of terror that gave rise to the plaintiffs' suits. Both groups' judgments against Syria remain unsatisfied, and both have sought to satisfy them in part by attaching Syrian assets in the Northern District of Illinois.

In a series of decisions, the district court in the Northern District of Illinois held that the Gates plaintiffs' liens on assets in Illinois are entitled to priority over those of the Baker plaintiffs. In the two orders we review here, the district court ordered those holding the assets to turn them over to the Gates plaintiffs. The Baker plaintiffs, who were intervenors in the district court, have appealed both final turnover orders. We affirm both orders in favor of the Gates plaintiffs.

We explain in Part I the legal structures and rules for obtaining and enforcing judgments under the FSIA in cases of state-sponsored terrorism. In Part II, we lay out the detailed procedural background for these appeals. In Part III, we hold for two independent reasons that 28 U.S.C. § 1610(c) does not give the Baker plaintiffs priority over the Gates plaintiffs. In Part IV, we address several remaining issues and hold that parallel proceedings brought by the Baker plaintiffs in the

4                                          Nos. 13-2280 & 14-1452

Southern District of New York do not provide any basis for
disturbing the decisions of the Northern District of Illinois.


### I. *The FSIA and Civil Remedies for State-Sponsored Terrorism*

Congress has chosen civil litigation under the FSIA rather
than international diplomacy as the monetary remedy for
U.S. victims of state-sponsored acts of terror. These appeals
stem from the fact that the FSIA does not provide a mecha-
nism for distributing equitably among different victims any
Syrian assets in the United States that are subject to attach-
ment. Instead, victims who finally obtain judgments must
then engage in the costly, burdensome, and often fruitless
task of searching for available assets.

These victims of terror can then find themselves pitted in
a cruel race against each other–a race to attach any available
assets to satisfy the judgments. The terms of the race are es-
sentially winner-take-all rather than any equitable sharing
among victims of similar losses. Under the FSIA's compensa-
tion scheme, a terrorism judgment against Syria can be satis-
fied only at the expense of other terrorism victims.[1]

Lawsuits against foreign states in United States courts
raise special substantive and procedural problems. The cen-

---

[1] Judge Lamberth has presided over numerous terrorism-related FSIA
cases. He has observed that the executive branch of the United States
government frequently opposes FSIA judgment-holders' attempts to at-
tach foreign assets because it views those assets as providing important
leverage in negotiations with foreign powers. FSIA judgment-holders
thus often find themselves fighting not only each other but also the fed-
eral government. See *In re Islamic Republic of Iran Terrorism Litigation*, 659
F. Supp. 2d 31, 125–29 (D.D.C. 2009).

tral substantive problem such suits must confront is foreign sovereign immunity. The FSIA codifies the general rules with respect to both immunity from suit and immunity from attachment of assets. See 28 U.S.C. § 1604 (immunity from suit), § 1609 (immunity from attachment and execution); *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 793–94 (7th Cir. 2011). The FSIA also recognizes several exceptions to these general immunities. See 28 U.S.C. §§ 1605–07 (exceptions to foreign state immunity from suit), §§ 1610–11 (exceptions to foreign state property's immunity from attachment and execution).

The FSIA adopted a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Republic of Argentina v. NML Capital, Ltd.*, No. 12-842, 573 U.S. ---, --- (2014) (slip op. at 6), quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983). The FSIA is therefore the sole basis for jurisdiction over a foreign state in a United States court. *Rubin*, 637 F.3d at 793–94; *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 38–39 (D.D.C. 2009). Any suit against a state sponsor of terrorism and any attachment pursuant to a judgment against a state sponsor of terrorism must fall within the FSIA's statutory exceptions to foreign sovereign immunity.

Among the exceptions, the FSIA allows victims of state-sponsored terrorism to pursue actions against and to attach the property of state sponsors of terrorism. Section 1605A creates an exception to foreign sovereign immunity for suits seeking money damages for personal injury or death resulting from an act of state-sponsored terrorism. Plaintiffs winning judgments against state sponsors of terrorism can then

use several FSIA exceptions to the attachment and execution immunity of foreign states' United States property. See 28 U.S.C. § 1610. These provisions make it possible to sue a state sponsor of terrorism in a United States court and to attach assets to satisfy judgments against such foreign states.

Suing foreign states in United States courts also raises procedural issues. In particular, it is difficult to ensure that a foreign state receives notice of a United States proceeding against it and has a meaningful opportunity to participate. The FSIA establishes special service and notice requirements for suits against foreign states, including notice of default judgments obtained against them. See 28 U.S.C. § 1608(e). Section 1610(c) delays attachment and execution to satisfy most judgments against foreign states until a court determines that a reasonable period of time has elapsed following the entry of judgment and (in case of a default judgment) service of the judgment on the foreign state under § 1608(e).

These provisions work together to ensure that foreign states receive sufficient notice of United States legal proceedings instituted against them, as well as an opportunity to participate in those proceedings and an opportunity to respond to a default judgment before attachment of and execution against the foreign state's assets in the United States.

The lien priority dispute between the Gates and Baker plaintiffs presents two principal legal issues under this statutory scheme. The first is whether § 1610(c), which requires a court's permission before a judgment-holder begins to attach a foreign state's assets in the United States, applies to judgments based on state-sponsored terrorism under §1605A that are executed pursuant to § 1610(g), which is an exception to foreign sovereign attachment immunity that applies only to

execution of judgments for state-sponsored terrorism. The second question arises if § 1610(c) applies at all here. It is whether a judgment-holder must obtain a new § 1610(c) order in each district where she seeks to attach assets, or whether just one such order suffices.

## II. *Factual and Procedural Background*

### A. *Securing the Judgments*

Against this legal backdrop, we turn to the details of the dispute in these appeals. Syria has been designated a state sponsor of terrorism since 1979. The Gates plaintiffs and the Baker plaintiffs both filed suits against Syria in the United States District Court for the District of Columbia under the FSIA's then-current terrorism exception to foreign sovereign immunity, which was codified at 28 U.S.C. § 1605(a)(7).

While both suits were pending, Congress repealed § 1605(a)(7) in January 2008 and replaced it with a new terrorism exception to foreign sovereign immunity, codified at 28 U.S.C. § 1605A. See National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).

Both cases then proceeded under § 1605A, and both groups of plaintiffs eventually prevailed. The D.C. District Court entered a judgment for $413 million for the Gates plaintiffs, while the Baker plaintiffs obtained a judgment for $602 million. See *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008); *Baker v. Socialist People's Libyan Arab*

*Jamahirya*, 775 F. Supp. 2d 48 (D.D.C. 2011). Both judgments are final.[2]

B. *The Race for Syrian Assets*

The District Court for the District of Columbia issued an order pursuant to 28 U.S.C. § 1610(c) for the Gates plaintiffs on August 23, 2011, finding that "a reasonable period of time has elapsed from the entry of final judgment and notice to Syria thereof to the date of entry of this Order for attachment and execution to proceed, and accordingly, Plaintiffs are hereby authorized to enforce this Court's judgment." The District of Columbia court issued a similar order for the Baker plaintiffs on September 1, 2011.

The Gates plaintiffs and the Baker plaintiffs each sub-poenaed the U.S. Department of Treasury Office of Foreign Assets Control to obtain information about any Syrian assets in the United States that could be attached to satisfy their judgments. The Office responded pursuant to a protective order and told both groups that some Syrian assets were located in the Northern District of Illinois. Both groups of plaintiffs rushed to register their judgments there and to attach the funds pursuant to 28 U.S.C. § 1610(g). That's a special provision allowing attachment of assets in the United States belonging to foreign states and their agencies and instrumentalities to execute judgments based on acts of state-sponsored terrorism.

---

[2] The D.C. Circuit affirmed the judgment in the *Gates* case on May 20, 2011. *Gates v. Syrian Arab Republic*, 646 F.3d 1 (D.C. Cir. 2011). In the *Baker* case, Syria filed a consent motion to dismiss its appeal, and the D.C. Circuit dismissed the appeal on October 19, 2011. See *Baker v. Qadhdhafi*, 2011 WL 5515579 (D.C. Cir. Oct. 19, 2011).

Nos. 13-2280 & 14-1452                                     9

The FSIA does not provide its own attachment and execution procedures. See *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010). Federal Rule of Civil Procedure 69(a) provides that attachment and execution procedures to satisfy a federal judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Since the parties are seeking attachment in the Northern District of Illinois, we look to Illinois law to determine the priority of the liens on the Syrian assets. See *Hegna v. Islamic Republic of Iran*, 380 F.3d 1000, 1006–07 (7th Cir. 2004); *Peterson*, 627 F.3d at 1130 (collecting cases).

A lien can be created under Illinois law by service of a "citation to discover assets." See 735 ILCS 5/2-1402(m); *Dexia Credit Local v. Rogan*, 629 F.3d 612, 632 (7th Cir. 2010). A garnishment notice also creates a lien under Illinois law. See 735 ILCS 5/12-707(a); *In re Schweke*, 164 B.R. 751, 752 (N.D. Ill. Bankr. 1994). Priority of competing liens is determined based on the order in which the competing liens were obtained. E.g., *Federal National Mortgage Ass'n v. Kuipers*, 732 N.E.2d 723, 726 (Ill. App. 2000) ("A lien that is first in time generally has priority and is entitled to prior satisfaction of the property it binds.").

On December 8, 2011, the Gates plaintiffs registered their judgment in the Northern District of Illinois and served on JP Morgan Chase Bank a citation to discover Syrian assets it might have been holding. They filed their § 1610(c) order from the District of Columbia in the Northern District of Illinois, but they did not seek or obtain a second § 1610(c) order from the Northern District of Illinois. This procedural choice is at the center of these appeals.

The bank's response to the Gates plaintiffs' citation identified two groups of responsive accounts relevant to this appeal: an AT&T account containing frozen funds belonging to Syrian Telecom, and two accounts containing blocked electronic funds transfers belonging to the Banque Centrale de Syrie. Based on this information, the Gates plaintiffs served AT&T with a citation to discover assets on February 9, 2012 seeking any other responsive AT&T assets besides the account at JP Morgan Chase. The Gates plaintiffs also pursued other responsive accounts at JP Morgan Chase Bank.

On February 13, the Baker plaintiffs filed a motion to intervene in the *Gates* case. The Baker plaintiffs had not registered their judgment in the Northern District of Illinois until December 15, 2011, several days after the Gates plaintiffs. (See Case No. 1:11-cv-08913.) Unlike the Gates plaintiffs, however, the Baker plaintiffs sought and obtained a new § 1610(c) order from the Northern District of Illinois on December 16. The Baker plaintiffs then served JP Morgan Chase Bank with two garnishment notices: a narrow initial notice served on December 16, and a broader amended notice served on January 5, 2012.[3]

The Baker plaintiffs argued that the Gates plaintiffs' failure to obtain a new § 1610(c) order from the Northern Dis-

---

[3] We take our account of the Baker plaintiffs' case from their motion to intervene and the district court's March 7, 2012 order. However, the Baker plaintiffs' garnishment notices, their § 1610(c) order from the Northern District, and their turnover motion are not in the record in this case. Because we decide that the Gates plaintiffs have established a priority lien on the assets, we need not resolve the status of the Baker plaintiffs' lien. We therefore assume for the sake of argument that the Baker plaintiffs' account is accurate.

Nos. 13-2280 & 14-1452                                              11

trict of Illinois violated the FSIA and nullified the Gates
plaintiffs' liens. The district court held that the Gates plain-
tiffs' § 1610(c) order from the District of Columbia court
complied with the FSIA and that the Gates plaintiffs' liens on
the Syrian assets had priority. The district court eventually
issued two turnover orders. The first, issued on May 13,
2013, ordered AT&T to turn over to the Gates plaintiffs the
frozen Syrian Telecom funds. The second, issued on Febru-
ary 3, 2014, ordered JP Morgan Chase Bank to turn over to
the Gates plaintiffs funds belonging to the Banque Centrale
de Syrie. The Baker plaintiffs have appealed both orders. The
appeal of the first order (No. 13-2280) had just been argued
when the second appeal (No. 14-1452) was filed. Because the
legal issues are essentially identical, we have consolidated
the two appeals for purposes of decision.

### III. *28 U.S.C. § 1610(c)*

The Baker plaintiffs argue that the Gates plaintiffs could
not attach either group of the Syrian assets in the Northern
District of Illinois without obtaining a new § 1610(c) order
from that court. Section 1610(c) states in its entirety: "No at-
tachment or execution referred to in subsections (a) and (b)
of this section shall be permitted until the court has ordered
such attachment and execution after having determined that
a reasonable period of time has elapsed following the entry
of judgment and the giving of any notice required under sec-
tion 1608(e) of this chapter."

After the Gates plaintiffs secured their judgment, the Dis-
trict Court for the District of Columbia issued on August 23,
2011 an order under § 1610(c) determining that attachment

could proceed because enough time had passed following the entry of their judgment and the notice thereof to Syria. The Gates plaintiffs contend first that § 1610(c) does not apply at all and second that even if it does, one order per judgment suffices for attachment and execution any-where in the United States. The Baker plaintiffs contend that the District of Columbia order allowed the Gates plaintiffs to pursue attachment only in the District of Columbia and that a new § 1610(c) order is needed in each judicial district where assets are sought. If the Baker plaintiffs were correct, then the Gates plaintiffs would not have obtained a prior valid lien to the Syrian assets in Illinois. We agree with the Gates plaintiffs on both grounds.

### A.  *The Scope of § 1610(c)*

First, § 1610(c) simply does not apply to the attachment of assets to execute judgments under § 1610(g) for state-sponsored terrorism.

Section 1610(c) applies to "attachment or execution referred to in subsections (a) and (b) of this section." Subsections (a) and (b) establish a number of specific exceptions to foreign sovereign immunity from attachment or execution. Those exceptions apply based upon a variety of factors, including the type of property, the use of the property, whether it was related to the lawsuit in question, and in some cases the type of lawsuit.

 The Gates plaintiffs are not seeking attachment under § 1610(a) or (b). They seek attachment under § 1610(g), which authorizes attachment of property of foreign state sponsors of terrorism and their agencies or instrumentalities

to execute judgments under § 1605A for state-sponsored ter-
rorism. Section 1610(g) is not mentioned in § 1610(c). By its
terms, then, § 1610(c) simply does not apply to execution or
attachment under § 1610(g). That conclusion is also con-
sistent with the more general tools of statutory interpretation
and the structure of the FSIA.

The decision to include references to § 1610(a) and
§ 1610(b) while not including a reference to § 1610(g) is a
strong indication that § 1610(c)'s requirement applies only to
attachments under § 1610(a) and (b), and not to attachments
under § 1610(g). See *Walters v. Industrial and Commercial Bank
of China, Ltd.*, 651 F.3d 280, 297 (2d Cir. 2011) ("Through this
explicit cross-reference to § 1610(a) and (b), § 1610(c) clearly
signals that execution depends on a judicial determination
that the property at issue falls within one of the exceptions to
immunity set forth in those subsections.").

Section 1610(g) was added to the FSIA as part of the 2008
FSIA Amendments. The other 2008 FSIA Amendments un-
dermine any suggestion that Congress' omission of a refer-
ence to § 1610(g) in § 1610(c) might have been an oversight
that courts should "correct" by interpretation. Congress re-
placed the then-existing terrorism exception to immunity
from suit, then codified at 28 U.S.C. § 1605(a)(7), with a
broader terrorism exception now codified at 28 U.S.C.
§ 1605A. See *In re Islamic Republic of Iran Terrorism Litigation*,
659 F. Supp. 2d at 58–59.

Congress also made several changes to the FSIA's at-
tachment provisions to facilitate satisfaction of judgments
obtained under § 1605A. *Id.* at 61–62. Congress amended the
FSIA's existing attachment provisions, codified at § 1610(a),
(b), and (f), to make them available to holders of state-

sponsored-terrorism judgments under § 1605A. See 28 U.S.C.
§ 1610(a)(7), 1610(b)(3), 1610(f)(1)–(2). Congress also added
§ 1610(g), a new, powerful attachment provision available
only to victims of state-sponsored terrorism who hold judg-
ments under § 1605A. See 28 U.S.C. § 1610(g)(1) (allowing
attachment of property of a foreign state "against which a
judgment is entered under section 1605A").[4]

Despite having amended § 1610(a), (b) and (f) to add ref-
erences to § 1605A, Congress did not amend § 1610(c) to add
a reference to § 1610(g). Surrounded by other references,
Congress' silence is a strong textual indication that § 1610(c)
does not apply to efforts to enforce judgments under § 1605A
through § 1610(g).

Faced with § 1610(c)'s lack of a reference to § 1610(g), the
Baker plaintiffs essentially argue that § 1610(a) and (b), both
of which are referenced in § 1610(c), are so similar to
§ 1610(g) that we should extend the scope of § 1610(c) to at-
tachments under § 1610(g). We are not convinced. Section
1610(g) differs substantially from § 1610(a) and (b). Both
§ 1610(a) and (b) are available to all holders of FSIA judg-
ments, not just to victims of state-sponsored terror. Sections
1610(a) and (b) are available to satisfy a wide variety of
judgments, but they allow attachment of only specific cate-
gories of assets to satisfy those judgments. See, e.g., § 1610(a)
(allowing attachment of foreign state property located in the
United States and used for commercial activity there);

---

[4] Section 1610(g) is unavailable even to holders of judgments pursuant to
the now-repealed § 1605(a)(7), unlike the terrorism-specific portions of
§ 1610(a) and § 1610(b), which remain available to judgment-holders un-
der both provisions. See § 1610(a)(7) and (b)(3).

Nos. 13-2280 & 14-1452                                            15

§ 1610(b) (allowing attachment of property of foreign state agency or instrumentality engaged in United States commercial activity).

By contrast, § 1610(g) is available only to holders of judgments under the § 1605A exception for state-sponsored terrorism, but it allows attachment of a much broader range of assets to satisfy those judgments. Specifically, § 1610(g) allows attachment of the property of a foreign state but also property of an agency or instrumentality "that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity." Attachment is allowed "regardless of" whether the foreign state exercises economic control over the property, receives the profits of the property, manages the property, controls its daily affairs, or is the sole beneficiary in interest of the property. § 1610(g)(1).

This language was intended to avoid limits the Supreme Court had imposed on the ability of litigants to attach the assets of foreign state agencies and instrumentalities under § 1610(b). The Court had held that U.S. courts should ordinarily respect the separate juridical identities of such agencies and instrumentalities, with narrow exceptions. See *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983) (cannot attach property of separate juridical entity unless entity is exclusively controlled by foreign state or recognizing separate status of entity and state would work fraud or injustice). Section 1610(g) provides that in cases of state-sponsored terrorism, assets of the defendant's agencies and instrumentalities are subject to attachment and execution regardless of factors that would ordinarily insulate such assets in other contexts governed by § 1610(a) and (b).

Finally, our interpretation of § 1610(c) is consistent with the broader legislative purpose of the 2008 FSIA Amendments to make it easier for terrorism victims to obtain judgments and to attach assets. See *In re Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d at 58–63 (D.D.C. 2009) (detailed discussion of 2008 Amendments). Exempting attachments under § 1610(g), that is, attachments stemming from terrorism-related judgments, from § 1610(c)'s solicitous notice requirements is entirely consistent with the liberalizing purpose of the 2008 Amendments.

### B.  *One § 1610(c) Order Per Judgment is Enough*

Even if § 1610(c) applied to attachment efforts under § 1610(g), the Gates plaintiffs complied with § 1610(c) in the District of Columbia before they sought attachment of the Syrian assets in the Northern District of Illinois. Section 1610(c) requires "the court" to determine "that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter."

Where such a determination is required, one suffices for attachment efforts throughout the United States. There is no reason for later courts to revisit an earlier determination that sufficient time has passed to allow attachment. Time's arrow always moves in the same direction. As the district court explained here, the amount of time between the entry of judgment and the attempt to attach property will only grow, so the passage of time between the first and later attachment attempts can only strengthen the case for a § 1610(c) order, not weaken it. In fact, requiring later courts to revisit the is-

sue would waste judicial resources and create the possibility
of inconsistent rulings. See *Agudas Chasidei Chabad of United
States v. Russian Federation*, 798 F. Supp. 2d 260, 270–71
(D.D.C. 2011) ("The purpose of obtaining an order finding
compliance with § 1610(c), then, is to permit a FSIA plaintiff
to establish that one of the prerequisites is satisfied so that
the plaintiff may pursue specific attachments without worry
over any lingering § 1610(c) requirements.").

The Baker plaintiffs rely on *Levin v. Bank of New York*,
2011 WL 812032 (S.D.N.Y. March 4, 2011), to support a con-
trary result. Among the various plaintiffs in *Levin*, two
groups are relevant to this issue. The Levins obtained a
judgment against Iran under § 1605(a)(7) and sought at-
tachment to satisfy that judgment in the Southern District of
New York. The Heisers, who also held a judgment against
Iran, challenged the Levins' priority lien on Iranian assets in
New York. The court held that the Levins could not attach
the Iranian funds because they had not obtained any
§ 1610(c) order from any court before seeking attachment of
assets in the Southern District of New York, as required to
attach property to satisfy a judgment under § 1605(a)(7). *Id.*
at *11. The court then held that the Heisers were similarly
unable to attach the assets because they had served their
garnishment writs on the New York banks in Maryland,
when they should have served them in New York. *Id.* at *12.

Both situations differed markedly from this case. First
and foremost, since the Levins had obtained their judgment
under § 1605(a)(7), not § 1605A, they were not pursuing at-
tachment under § 1610(g), which is available only to holders
of judgments under § 1605A. See *Levin*, 2011 WL 812032, at
*8. Second, the Levins had failed to obtain any § 1610(c) or-

der at all before pursuing attachment in the Southern District of New York. *Id*. The question before the Southern District of New York, therefore, was whether plaintiffs need to obtain a § 1610(c) order in *any* court before pursuing attachment under § 1610(a) or (b). Under the plain text of § 1610(c), the answer was yes, of course, but the questions we decide are different and are governed by different statutory language.

The Heisers' situation also is not similar to this case. The problem with the Heisers' lien was not any issue with their § 1610(c) order but a venue issue. They served New York banks in Maryland, which was held improper under New York attachment law. *Id.* at *11. The court said nothing about the Heisers' § 1610(c) order beyond noting that they had obtained one.

The Gates plaintiffs obtained a determination from the D.C. District Court that sufficient time had passed following the entry of their judgment for attachment to proceed. They were not required to seek a duplicative determination of the same question by the Northern District of Illinois before attaching the Syrian assets. For two independent reasons, then, § 1610(c) does not bar the priority of the Gates plaintiffs' liens on the Syrian assets in the Northern District of Illinois ahead of the Baker plaintiffs' liens.

IV. *The New York Proceedings and Related Issues*

The Gates plaintiffs attached the Syrian assets in the Northern District of Illinois before the Baker plaintiffs did, and as noted above, under Illinois law, the parties first in time are treated as first in right. We turn now to several re-

maining issues, including whether proceedings filed by the Baker plaintiffs in the Southern District of New York affect the priority of the Gates plaintiffs' liens on the Syrian assets.

### A. *The Baker Plaintiffs' New York Writs of Execution*

After the Gates plaintiffs had registered their judgment in the Northern District of Illinois and served citations to discover assets, the Baker plaintiffs filed separate, parallel proceedings in the Southern District of New York. United States Marshals served JP Morgan Chase Bank in New York with two New York writs of execution: one on February 23, 2012, and the other on November 9, 2012.

The Baker plaintiffs claim that these writs of execution perfected a lien under New York law over the Banque Centrale de Syrie (BCS) funds in the hands of JP Morgan Chase Bank. The Baker plaintiffs also claim that the Gates plaintiffs' citations were not enough to perfect liens over the Syrian funds under Illinois law and that liens are not perfected under Illinois law until entry of a turnover order. If that were correct, the Gates plaintiffs would not have perfected a lien on the BCS funds until the district court entered a turnover order regarding those funds on November 15, 2013, after the Baker plaintiffs claim they perfected a lien on the BCS funds under New York law.

We disagree. For starters, the Baker plaintiffs made this argument for the first time in their motion for reconsideration of the Illinois district court's turnover order regarding the BCS funds. That was too late to raise a new legal theory that could have been raised earlier in the case. *Russell v. Delco Remy Division of General Motors Corp.*, 51 F.3d 746, 749

20                                    Nos. 13-2280 & 14-1452

(7th Cir. 1995) (motions for reconsideration "may not be used to raise novel legal theories that a party had the ability to address in the first instance"). Accordingly, the argument is forfeited.

In any event, on the merits the Baker plaintiffs are wrong about Illinois law. Service of a citation to discover assets both creates and perfects a lien under Illinois law at the time of service. 735 ILCS 5/2-1402(m) ("The judgment or balance due on the judgment becomes a lien when a citation is served"); *TM Ryan Co. v. 5350 South Shore, L.L.C.*, 836 N.E.2d 803, 808–09 (Ill. App. 2005) (a lien is "perfected at the time of service"); *Cacok v. Covington*, 111 F.3d 52, 54 (7th Cir. 1997) ("under 735 ILCS 5/2-1402(m) … [t]he lien is considered perfected as of the date of service of the citation"). The lien applies to the judgment debtor's assets in possession of the citation respondent. *In re Swartz*, 18 F.3d 413, 416–17 (7th Cir. 1994). Under Illinois law, therefore, the Gates plaintiffs perfected a lien over the BCS funds held by JP Morgan Chase Bank when they served the bank with a citation to discover assets on December 8, 2011, well before the Baker plaintiffs served the bank with their New York writs of execution in 2012. The Gates plaintiffs hold a priority lien over the BCS funds held by JP Morgan Chase Bank. *Kuipers*, 732 N.E.2d at 726.[5]

---

[5] To the extent that the Baker plaintiffs argue that New York law should determine lien priority, the result would be the same. See *New York v. Panzirer*, 23 A.D.2d 158, 160 (N.Y. App. Div. 1965) (New York law follows first-in-time, first-in-right rule to determine priority of liens).

Nos. 13-2280 & 14-1452                                    21

**B.** *The Baker Plaintiffs' Request for Dismissal*

Next, the Baker plaintiffs ask us to dismiss this case altogether in favor of their proceedings in the Southern District of New York. They argue that the Syrian assets held by AT&T are actually located in New York rather than Illinois. Because the Baker plaintiffs have already commenced actions in the Southern District of New York to attach the Syrian assets, dismissal of the Gates plaintiffs' Illinois case would place the Baker plaintiffs ahead of the Gates plaintiffs.

We see utterly no reason to dismiss this case. It is undisputed that the Northern District of Illinois has personal jurisdiction over all the parties, including AT&T and JP Morgan Chase Bank. It is also undisputed that the Northern District of Illinois can attach the funds even if they are located in New York. Under Illinois law, a court can attach a party's intangible assets as long as it has jurisdiction over the party, even if the assets are located outside the judicial district. In other words, jurisdiction does not depend on the location of the debtor's intangible assets. *Park v. Townson & Alexander Inc.*, 679 N.E.2d 107, 109 (Ill. App. 1997). The Northern District of Illinois therefore had jurisdiction to decide the parties' dispute and to attach the Syrian assets.

Parallel proceedings in separate federal courts should ordinarily prompt judicial action to avoid duplicative efforts. See *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (general rule to avoid duplicative litigation in federal courts); *Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183–84 (1952); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 279 (7th Cir. 1988) (dismissing later-filed duplicative case); *Martin v. Graybar Electric Co.*, 266 F.2d 202, 203 (7th Cir. 1959) (reversing denial

of injunction against duplicative case); 6 Wright & Miller, Federal Practice & Procedure § 1418.

Here the district court chose not to dismiss the earlier-filed *Gates* action but instead enjoined the Baker plaintiffs from pursuing their duplicative action in New York. The district court weighed the relevant considerations and did not abuse its discretion in doing so. The Northern District of Illinois obtained jurisdiction over the parties and the Syrian funds before the Southern District of New York did, and there is no claim that the Northern District of Illinois is an inconvenient forum. Deferring to the later-filed case would encourage piecemeal litigation rather than avoid it. It would be a mistake to reward the Baker plaintiffs' attempt to trump priority in the Northern District of Illinois by filing a later, duplicative action in another district seeking to attach the same assets. The equities thus weigh decisively in favor of the Illinois court retaining jurisdiction.

We are mindful of the fact that the Baker plaintiffs, like the Gates plaintiffs, are the victims of horrific terrorist acts for which Syria is responsible. We also understand that the current statutory scheme pushes the holders of judgments based on state-sponsored terrorism to pursue all possible avenues to secure even partial justice. Such duplicative litigation, however, wastes judicial and party resources and needlessly muddles proceedings in both districts.

### C. *The Gates Plaintiffs' Motion to Dismiss Appeals*

Finally, showing that neither side has a monopoly on slick procedural maneuvers, after we held oral argument the Gates plaintiffs filed a motion to dismiss or for summary affirmance. The motion argues that the Baker plaintiffs made a

decisive procedural error by failing to file a separate notice
of appeal in the interpleader action filed by JP Morgan Chase
Bank. In the district court, Judge Kendall wrote one order
dated February 3, 2014, and docketed it in both the Gates
plaintiffs' attachment suit and the interpleader action.

The Gates plaintiffs contend that the order was in effect a
double judgment and that the Baker plaintiffs, by appealing
only in the Gates plaintiffs' attachment proceeding, allowed
the identical order to become final in the interpleader case.
As the Gates plaintiffs see things, when the time to appeal
ran out in the interpleader action, the same order that is on
appeal here in No. 14-1452 became a final judgment in the
interpleader action that is entitled to res judicata or collateral
estoppel effect, meaning that we should either summarily
dismiss these appeals or affirm on that basis.

We have no doubt that such a result would stun Judge
Kendall, who carefully framed her order of February 3, 2014
to resolve the interpleader action while also avoiding any
interference with the then-pending appeal to this court in
No. 13-2280. The February 3, 2014 order resolved the inter-
pleader action by ordering JP Morgan Chase Bank to deposit
the BCS funds in question into the district court's registry
pursuant to Federal Rule of Civil Procedure 67, to be held
there during the pendency of these appeals for later distribu-
tion by order of the district court.

Under these circumstances, we agree with the Baker
plaintiffs that there was no need for them to have filed a sec-
ond notice of appeal. Both res judicata and collateral estop-
pel are rooted in equity. *Blonder-Tongue Laboratories, Inc. v.
University of Illinois Foundation*, 402 U.S. 313, 333–34 (1971)
("no one set of facts, no one collection of words or phrases,

24                                    Nos. 13-2280 & 14-1452

will provide an automatic formula for proper rulings on es-
toppel pleas. In the end, decision will necessarily rest on the
trial courts' sense of justice and equity."); see also *Commis-
sioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948).
In light of the district court's careful efforts to limit the ef-
fects of its order, it would not be equitable to resolve these
appeals by applying either doctrine.


*Conclusion*

The Gates plaintiffs have complied with the requirements
of the FSIA and have established a priority lien on the Syrian
funds at issue in these appeals. Under the winner-take-all
system established by the applicable legislation and legal
principles, we AFFIRM both of the district court's orders to
have Syrian assets turned over to the Gates plaintiffs.